## Morton H. HALPERIN

v.

## DEPARTMENT OF STATE et al., Appellants.

### No. 76–1528.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 21, 1976.

Decided Aug. 16, 1977.

* Sitting by designation pursuant to Title 28, U.S.C. § 294(d).

Irwin Goldbloom, Atty., Dept. of Justice, Washington, D. C., for appellants. Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., Leonard Schaitman, Karen K. Siegel, Attys., Dept. of Justice, Washington, D. C., and Monroe Leigh, Legal Advisor, Dept. of State, were on the brief, for appellants. Morton Hollander, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellants.

Morton H. Halperin, appellee pro se, with whom John H. F. Shattuck, Washington, D. C., was on the brief, for appellee.

Before WRIGHT, McGOWAN and MacKINNON, Circuit Judges.

Opinion for the Court filed by McGOWAN, Circuit Judge.

McGOWAN, Circuit Judge:

Appellee in this Freedom of Information Act (FOIA) case seeks to compel disclosure of deleted portions of the transcript of a so-called "background" press conference held by former Secretary of State Kissinger

on December 3, 1974. Appellants assert that the disputed material was properly classified pursuant to an Executive order, and therefore is exempt from mandatory disclosure under FOIA. 5 U.S.C. § 552(b)(1) (Supp. IV 1974). It is further contended that any disclosure, mandatory or discretionary, would be highly undesirable, since official attribution of the deleted passages to the former Secretary would adversely affect the negotiating position of the United States in the strategic arms limitations talks (SALT) with the Soviet Union.

The District Court found that the State Department, in deciding to classify sections of the press conference transcript, had not taken into account procedural and substantive criteria established by the relevant Executive order. Having held that the material sought did not fall with any statutory exception to FOIA's disclosure requirements, the court did not think it necessary to examine in camera the material in question as requested by appellants. Instead, the court simply ordered release of the deleted passages to appellee.

Because of an almost incredible inattention by the State Department to the governing classification requirements for invocation of the FOIA national security exemption, we cannot fault the District Court's finding of failure to meet those requirements. However, in light of appellants' representations as to the highly sensitive nature of the material involved, we remand the case to the District Court for the purposes hereinafter appearing.

I

Some familiarity with the characteristics of the "background" press conference is essential to an understanding of the present controversy. The State Department background briefing is designed to permit dissemination of information to the public, while simultaneously avoiding the risks allegedly associated with direct quotation of high-ranking government personnel or official attribution of sensitive statements to government sources identified by name. Members of the press invited to attend such background briefings are expected to adhere to certain rules governing their reporting of the subjects discussed. The record does not reveal whether these rules have been reduced to writing, or whether any formal indication of assent thereto is demanded before individual newsmen are allowed to participate. In any event, the parties apparently agree that the rules are generally known and observed, and, in particular, were not directly violated by any reporters in attendance at Secretary Kissinger's December, 1974 conference.[1]

The rules require that only paraphrase be used in reporting remarks made at background press conferences. In addition, information provided on a "background" basis may be attributed only to unnamed "senior State Department officials," not to any specific individuals. When information is provided on a so-called "deep background" basis, even its State Department origin must be concealed. In those instances, the press may refer only to "informed sources."

In November, 1974, President Ford and General Secretary Brezhnev met in Vladivostok for talks which led to an agreement outlining the future course of SALT. In the aftermath of the Vladivostok discussions, Secretary Kissinger conducted two background briefings, one on November 25, 1974, the other on December 3.[2] Of the

---

1. Appellee does maintain that the substance of one of the deleted transcript passages has in fact been made public. The disputed material allegedly appeared in a column by Admiral Zumwalt in the August 10, 1975 issue of the *Washington Star*. Though not himself present at the December, 1974 briefing, Zumwalt claimed that Secretary Kissinger had, on that occasion, told reporters that, as negotiations then stood, a particular Soviet aircraft would not be counted against the overall strategic vehicle limit to be imposed on the Soviet Union at the conclusion of SALT.

2. Appellee requested the transcript of the November 25 conference at the same time he sought the corresponding material from the December 3 briefing. The State Department released the November 25 transcript in its entirety, and, accordingly, that document is not at issue in this case.

more than 300 media representatives accredited to the State Department, fewer than forty were invited to the December 3 briefing. Thirty-two attended, including two representatives of foreign news agencies. None of these reporters had a security clearance, and none attended the press conference in the performance of any official duties. Portions of the briefing were explicitly placed in the "deep background" category.

After the conference, a verbatim transcript was prepared by the State Department, and approximately six copies were made. No classification markings were affixed to any of these copies, and, indeed, no classification determination was made at the time the transcript and copies were produced. Copies not distributed elsewhere within the State Department were kept in the Department's Office of Press Relations in a safe approved for the storage of classified information. Access to a copy of the transcript was permitted only with the authorization of either the Director or Deputy Director of the Office of Press Relations. At most, two or three reporters actually saw the written text of the December 3 briefing.[3] They were allowed to take notes on the transcript, but not to duplicate any portions thereof.

In a letter dated February 19, 1975, appellee requested a copy of the December 3 background press conference. Prompted by this request, George Vest, Director of the State Department's Bureau of Politico-Military Affairs, undertook a review of the transcript. Mr. Vest concluded that the entire 59-page text of the December 3 briefing should be released to appellee, with the exception of three deletions totalling 44 lines (approximately two pages). In a letter dated March 5, 1975, Mr. Vest informed appellee that the deletions were "classified on the ground that attribution of these remarks to the Secretary of State could damage the national security." Although

the March 5 letter did not disclose the precise status assigned to the deleted passages, Mr. Vest had in fact labelled all three excisions "Confidential."[4] Two of the three transcript sections withheld from appellee were in those portions of the press conference conducted on a "background" basis; the third was contained in the "deep background" part of the December 3 briefing.

Informed that the State Department would not comply completely with his FOIA request, appellee first pursued the administrative appeal to which he was entitled under 5 U.S.C. § 552(a)(6)(A). In a letter dated April 9, 1975, Carol Laise, Assistant Secretary of State for Public Affairs, announced that the Department's Council on Classification Policy had decided to sustain the partial denial of appellee's FOIA request. Tracking closely the language employed by Mr. Vest, the Assistant Secretary's letter explained that "[w]e have examined the passages deleted . . . and have concluded that their release in a form directly attributed to the Secretary of State could damage the national security."

On May 1, 1975, appellee filed a complaint in the District Court, alleging that the deleted material had not been properly classified pursuant to Executive Order 11652, and therefore could not qualify under FOIA's first exemption for protection from mandatory disclosure. Cross-motions for summary judgment were filed in November, 1975. On May 27, 1976, the District Court issued an order and memorandum opinion, granting appellee's motion for summary judgment and directing release of the disputed sections of transcript. Notice of appeal was filed on June 11, 1976, and, on June 14, this court granted a joint motion to stay disclosure pending appeal.

II

FOIA's first exemption immunizes from the Act's mandatory disclosure provisions those matters that are

---

3. The record does not clearly establish whether these reporters had attended the December 3 conference, or had been invited but had not attended, or had simply not been invited.

4. Under § 1(C) of Executive Order 11652, material may be classified "Confidential" if "its unauthorized disclosure could reasonably be expected to cause damage to the national security."

(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order.

5 U.S.C. § 552(b)(1) (Supp. IV 1974).[5] The Conference Committee Report on the 1974 FOIA amendments, S.Rep. No. 93–1200, 93d Cong., 2d Sess. 11–12, reprinted in [1974] U.S.Code Cong. & Ad.News 6267, 6290, indicates that by the addition of clause (B), Congress intended to require proper classification "pursuant to both procedural and substantive criteria contained" in the relevant Executive order. There being no further Presidential action on the subject following adoption of the 1974 amendments, the governing Executive order remains No. 11652, issued by President Nixon in March, 1972. 37 Fed.Reg. 5209 (1972). That order sets forth standards describing the material which may be classified and the appropriate level of secrecy to be assigned to particular information. The three available classification categories afford varying degrees of protection from authorized disclosure depending upon the classified material's significance to national security. In addition, Executive Order 11652 establishes procedures to be followed in classifying and declassifying information. Also included are rules regulating storage of and access to classified material. We list below those features of the Executive Order which bear on the present controversy.

As indicated previously (see note 4 supra), material may be classified "Confidential" only if "its unauthorized disclosure could reasonably be expected to cause damage to the national security." This criterion differs from that applicable before issuance of the currently effective Executive Order. Under Executive Order 10501, the predeces-

sor to 11652, material could be classified "Confidential" whenever unauthorized disclosure thereof "could be prejudicial to the defense interests of the nation." In his statement accompanying the publication of Executive Order 11652, President Nixon underscored the importance of the shift in phraseology.

Heretofore, material could be classified if the originator had any expectation of . . . damage [to the national security,] however remote. This new test [i. e. reasonable expectation] is intended to reduce the amount of protected information.

8 Weekly Comp. of Pres. Doc. 543–44 (March 13, 1972).

Section 7(A) of Order 11652 provides that "[t]he National Security Council shall monitor the implementation of this order." Pursuant to this authority, the NSC in May, 1972, issued a directive supplementing the Executive Order with further details. 37 Fed.Reg. 10053 (1972). Together, the Order and NSC Directive strictly limit access to classified information. Access may be granted only to persons with security clearances and only to persons the performance of whose official duties or contractual obligations requires such access.[6] As part of the general purpose to guard against excessive classification, both the Executive Order and the NSC Directive require that classified material be conspicuously marked as such, and that unclassified material be plainly distinguished from classified whenever both kinds of information are contained in a single document. Finally, the NSC Directive insists in unmistakable terms that

[a]t the time of origination, each document or other material containing classi-

---

**5.** Prior to the 1974 FOIA amendments, the first exemption covered matters that were "specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy." Even before Congressional addition of the "properly classified" language in 1974, this court had decided, in *Schaffer v. Kissinger*, 164 U.S.App.D.C. 282, 505 F.2d 389 (1974), that agencies withholding documents in

reliance on the (b)(1) exemption must demonstrate to the court that those documents were "properly classified pursuant to executive order." *Id.* at 391.

**6.** The only exceptions to this general rule involve historical researchers and former Presidential appointees. They clearly have no application in the present case.

fied information shall be marked with its assigned security classification and whether it is subject to or exempt from the General Declassification Schedule.

(Emphasis added.)

## III

Applying the above standards to the facts of the present case, the District Court correctly concluded that the press conference excerpts sought by appellee had not been properly classified in accordance with Executive Order 11652 and its implementing NSC Directive. Appellants have attempted to minimize the deficiencies of their classification process by stressing repeatedly that its objective was to prevent not disclosure of the substance of Secretary Kissinger's deleted remarks, but only public attribution of those remarks to the Secretary. We apprehend this distinction, but do not see it as affecting the propriety of the classification.

It is undisputed that reporters without security clearances and with no official duties necessitating access to classified information attended the December 3 briefing. No classification review was conducted either at the time of that briefing, or at the time the verbatim transcript of the press conference was prepared. No classification markings were affixed to the transcript copies stored in the State Department's Office of Press Relations. Appellants do not contest these facts. Nor do they deny that the NSC Directive requires assignment of security classifications and appropriate marking at the time documents containing classified information are produced.[7]

When, in response to appellee's FOIA request, Mr. Vest at long last examined the press conference transcript for classification purposes, he decided that three passages should be labelled "confidential," because their attribution to the Secretary of State "could damage the national security." Letter from George S. Vest to Morton H. Halperin (March 5, 1975). When questioned at his deposition in July, 1975, following the filing of appellee's complaint, Mr. Vest reiterated that he had deleted certain portions of the transcript because their release "could damage national security." Later in the deposition, Mr. Vest described his behavior when confronted with appellee's FOIA request:

I looked at the document, considered the national interest and what was involved and considered that to make these statements publicly, formally now and attribute them to the Secretary of State would be prejudicial to the national interest and I did not have any doubt about it.

J.A. 57.

The classification standard employed by Mr. Vest was not the one dictated by Executive Order 11652. That Order permits material to be designated "Confidential" only if its unauthorized disclosure "could reasonably be expected to cause damage to the national security." Both the language of the March 5 letter to appellee and Mr. Vest's answers to questions asked at his deposition demonstrate convincingly that the determination to classify parts of the briefing transcript was made without reference to the criterion set forth in the governing Executive Order, apparently because the veteran State Department employee

---

**7.** In a footnote to its reply brief, the government observes that "Section IV(A) of the Directive recognizes that a document may 'inadvertently' not be marked with a classification stamp." This observation is highly misleading. Section IV(A) describes the different stamps which should be used to indicate whether a given document containing classified information is subject to the General Declassification Schedule, is exempt from that schedule, or may be declassified at a time earlier than that

schedule would provide. The sentence from which the government has quoted the single word "inadvertently" states in full, "Should the classifier inadvertently fail to mark a document with one of the foregoing stamps the document shall be deemed to be subject to the General Declassification Schedule." This sentence in no way implies that failure to affix proper classification markings at the time of a document's origination lacks consequences for FOIA purposes.

making the classification was wholly unaware of the relevant and governing classification standards at the time he acted in response to appellee's request.[8]

Appellants maintain that Mr. Vest's deposition testimony reveals he followed a standard in fact more stringent than that required by Executive Order 11652. In support of this proposition, appellants cite Mr. Vest's statements that attribution of the deleted transcript passages to the Secretary of State "*would* be prejudicial to the national interest" and "*would* have had an injurious impact on the SALT negotiations." (Emphasis added.) Alternatively, it is contended that, even if the original classification was not effected in accordance with the Executive Order, subsequent reconsideration remedied any error that may have been committed.

■ Our response is twofold. First, the initial evidence of the "more stringent" test administered by Mr. Vest appears in his July, 1975 deposition.[9] The remarks upon which appellants rely were made nearly five months after the disputed transcript excerpts were classified, and nearly eight months after the December 3 press conference was held. Even if the comments quoted above stood entirely alone, testimony given in good faith in July, 1975, with the advice of counsel and in the context of a law suit, does not necessarily provide a precise reflection of the rationale behind the classification of certain transcript passages in March. But, of course, the particular bits of testimony highlighted by the government must be viewed in the context of Mr. Vest's March 5 letter and the remainder of his July deposition. When all available statements are considered, it is exceedingly difficult to identify a single, articulable standard which informed Mr. Vest's original classification decision. Certainly, the record affords no assurance that the governing standard of Executive Order 11652 was the basis of the belated classification made in this case.[10] We are thus in no position to rule that the District Court erred in holding that, since the deleted transcript passages were not "properly classified" pursuant to Executive Order 11652, they were not entitled to the statutory exemption from FOIA claimed for them by appellants.

---

8. Appellee suggests that Mr. Vest may have been guided in his classification decision by the terms of Executive Order 10501, which had been in effect prior to March, 1972. As noted above, that Order permitted material to be classified "Confidential" if its unauthorized disclosure "could be prejudicial to the defense interests of the nation." Appellants argue strenuously that appellee's contention has no basis in the record. We need not resolve the dispute over the source of the improper standard applied by Mr. Vest. For our purposes, it suffices to observe that the standard *was* improper, *i. e.*, it was not the one provided in Executive Order 11652.

9. Statements similar to those quoted in the text above were also included in Mr. Vest's affidavit of November 25, 1975, prepared to accompany the government's motion for summary judgment.

10. Indeed, even in Mr. Vest's November, 1975 affidavit, the precise phrasing of the Executive Order was not accurately duplicated. See J.A. 69.

The District Court's findings on this score are as follows:

Mr. George Vest, the State Department official who classified the relevant portions of the transcript, indicated when deposed that in classifying the deletions he did not consult the Executive Order or any other document and that he had never heard the phrase "could reasonably be expected to cause damage to the national security" prior to the deposition and that "it is not a phrase that has special meaning." (Vest deposition, p. 16). Furthermore, Mr. Vest indicated that he was not aware of the change made in the definition of confidential between the old and the new Executive Order. (Vest deposition, p. 19). While Mr. Vest's affidavit is entitled to substantial weight and while he undoubtedly acted in good faith in making his determinations, nevertheless, the classifications were not made in accordance with the procedural and substantive criteria expressed in the Executive Order and hence cannot provide the basis for the (b)(1) exemption as claimed. Defendant's *post hoc* justifications do not negate the fact that the deletions were not classified in accordance with the Executive Order.

## IV

The question remains as to whether the documentary material in issue should be released to appellee forthwith. Appellants urge that the resulting injury to the national interest would be so great that this should not be done without further proceedings in the District Court in which they could press upon the court the dimensions of this danger. They suggest that, once aware of the harm involved in release, the District Court has available to it the alternative of affording appellants an opportunity to effect the classification anew in a manner fully and manifestly responsive to the requirements of the Executive Order.

■ It seems evident to us that the State Department failed utterly to anticipate and to identify the problems presented by the enactment of the Freedom of Information Act in relation to the background press conference.[11] The long standing tradition underlying such conferences, and the special status accorded participating members of the press, have apparently obscured to the State Department's vision the fact that Congress has provided no special FOIA exception for the transcripts of such conferences. Those transcripts in the possession of the Department are potential subjects of FOIA requests like any other documents. If the Department is to rely, as it did here, on the national security exemption as its justification for declining such a request, it should have been at pains to effect the classification of the relevant document in the only way which legally qualified it for the exemption.

■ Having failed to follow the procedures established by their own branch of government, appellants ask us in effect to save them from the consequences of that failure by providing an exemption the Congress did not create. The power of a court to refuse to order the release of information that does not qualify for one of the nine statutory exemptions exists, if at all, only in "exceptional circumstances in which a court could fairly conclude that Congress intended to leave room for the operation of limited judicial discretion."[12] The need for this restriction on the power of the courts is apparent here. A broad judicial power to refuse to order disclosure of non-exempt information that a court feels would damage the national interest could obviously operate to frustrate the requirements of FOIA.

Nevertheless, we hesitate to order the release of material that would allegedly do grave damage to the national security without judicial scrutiny of the merits of that allegation. The responsibility of the courts to exercise some discretion in extreme circumstances is suggested by dicta in First Amendment cases involving prior restraint: "No one would question but that [when a nation is at war] a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops." *Near v. Minnesota*, 283 U.S. 697,

---

11. One would have thought that, in view of the deliberate and extensive, not to say daring, use it has made of that institution in the recent past, the Department would have been peculiarly alert to the searching out of all possible legal ramifications bearing on the security of the disclosures made at such conferences. Appellee, by virtue of his persistence, has at least benefited the nation by making the Department aware of the laws it must observe if these adventures are to be continued. It would thus appear that appellee has, irrespective of the outcome of the proceedings on remand, "substantially prevailed" within the meaning of 5 U.S.C. § 552(a)(4)(E) (Supp. IV 1974) relating to assessment against the United States of litigation expense, thereby fulfilling one of the conditions for the invocation of possible disciplinary proceedings under 5 U.S.C. § 552(a)(4)(F) (Supp. IV 1974).

12. *Soucie v. David*, 145 U.S.App.D.C. 144, 448 F.2d 1067, 1077 (1971); *accord, Tax Analysts & Advocates v. IRS*, 505 F.2d 350, 355 (D.C. Cir. 1974); *Getman v. NLRB*, 164 U.S.App.D.C. 243, 450 F.2d 670, 678 (1971). *See generally Rose v. Department of the Air Force*, 495 F.2d 261, 269 (2d Cir. 1974), *aff'd*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976); K. Davis, *Administrative Law of the Seventies* § 3A.6 (1976); *Project: Government Information and the Rights of Citizens*, 73 Mich.L.Rev. 971, 1150–56 (1975).

716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931). *See New York Times Co. v. United States,* 403 U.S. 713, 726, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971),[13] (Brennan, J., concurring), 730 (Stewart, J., concurring). Although the facts of this case are distinguishable from cases involving prior restraint of the publication of materials already in the hands of the would-be publisher, the underlying rationale of these dicta—a basic notion of national self-preservation—seems to apply in the circumstances before us.[14]

■ We therefore continue in effect our present stay of the judgment appealed from and remand the record to the District Court with instructions to examine the deleted portions of the transcript to determine the truth of appellants' allegations,[15] and to decide whether the danger caused by officially attributing these remarks to the former Secretary of State would be so great as to justify the exercise of extraordinary restraint. In evaluating the circumstances of this case, the District Court should be guided by an exacting standard similar to that suggested in *Near v. Minnesota.*[16]

In approaching the remand proceedings it may be highly relevant for all participants to be reminded that this is a FOIA case with a difference. *In camera* examination will presumably reveal no information that has not already been made known to the world through the press *except* for an offi-cial admission that its source was the then Secretary of State. Throughout this litigation from 1975 up to the time of our taking this appeal under submission in the autumn of 1976, the Government has professed to be intent on protecting from disclosure not what was said at the press conference (which it characterizes as long since in the public domain) but the identity—and, more importantly, the official status—of the person who said it. It would appear, therefore, that a preliminary inquiry upon remand could usefully be made into the consequences for this case of the fact that the person in question no longer occupies an official position.

This court's stay of the District Court's judgment is continued, and the record is remanded to that court for further proceedings consistent herewith.

*It is so ordered.*

---

**13.** Although *Near* involved a challenge to the constitutionality of a statute that imposed a prior restraint, the Executive Branch in the Pentagon Papers Case had to rely, as it does here, on its inherent power to restrict the distribution of sensitive information. *See New York Times Co. v. United States,* 403 U.S. 713, 720, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Douglas, J., concurring).

**14.** *Cf. Bridges v. California,* 314 U.S. 252, 282, 62 S.Ct. 196, 203, 86 L.Ed. 192 (1941) (Frankfurter, J., dissenting): "Free speech is not so absolute or irrational a conception as to imply paralysis of the means for effective protection of all the freedoms secured by the Bill of Rights."

**15.** At the same time that the District Court granted appellee's motion for summary judgment, it entered an order denying a pending motion by appellants for leave to submit the material in question for *in camera* examination.

**16.** We note in particular that the procedural infractions in this case included the release of the information in question in statements by former Secretary Kissinger to reporters without security clearances. As the District Court noted in its memorandum opinion, *Halperin v. Dep't of State,* No. 75–674 (D.D.C., May 27, 1976), this circumstance calls into question both the government's claim of serious adverse consequences and the potential effectiveness of continuing to withhold the information. *See United States v. Washington Post Co.,* 144 U.S. App.D.C. 326, 446 F.2d 1327, 1329, on petition for rehearing, 1331, 1332 *aff'd,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).