Harrison E. **SALISBURY,** Appellant,

v.

**UNITED STATES of America, et al.,** Appellee.

**No. 81–1657.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 12, 1982.

Decided Sept. 21, 1982.

---

Mark H. Lynch, Washington, D. C., with whom Susan W. Shaffer, Washington, D. C., was on the brief, for appellant.

Freddi Lipstein, Dept. of Justice, Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, and Leonard Schaitman, Dept. of Justice, Washington, D. C., were on the brief, for appellee.

Before ROBINSON, Chief Judge, McGOWAN, Senior Circuit Judge, and

NORTHROP *, Senior District Judge for the District of Maryland.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

Appellant Salisbury, a correspondent and editor with the *New York Times* brought suit in the District Court seeking the release of certain documents under the Freedom of Information Act. He also alleged, as a separate cause of action, that the National Security Agency (NSA) and the Secretary of Defense had violated his rights under the first and fourth amendments. As a remedy for the latter, he sought damages under the Federal Tort Claims Act and injunctive relief. In three separate orders, the District Court upheld the refusal of the NSA to release the disputed documents under *FOIA*, denied appellant's counsel the right to participate in *in camera* examination of documents, and dismissed the tort action. It is from these three orders that Salisbury appeals.

I

The National Security Agency, a separate agency within the Department of Defense, was created by presidential directive. Its purpose in part was

> to obtain information from foreign electromagnetic signals and to provide reports derived from such information or data on a rapid response basis to national policymakers and the intelligence community of the United States Government.

Affidavit of Eugene F. Yeates, Chief, Office of Policy, NSA, J.A. at 17. In pursuing this mission, NSA monitors radio channels. Because of the large number of available circuits, however, the agency attempts to select for monitoring only those which can be expected to yield the highest proportion of foreign intelligence communications. *Id.* at 20. When the NSA selects a particular channel for monitoring, it picks up all communications carried over that link. S.Rep. No.755, 94th Cong., 2d Sess., Book III 741

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

(1976). As a result, the agency inevitably intercepts some personal communications.

After intercepting a series of communications, NSA processes them to reject materials not of foreign intelligence interest. One way in which the agency isolates materials of interest is by the use of

[l]ists of words and phrases, including the names of individuals and groups . . . . These lists are referred to as "watch lists" by NSA and the agencies requesting intelligence information from them . . . . The great majority of names on watch lists have always been foreign citizens and organizations.

. . . . .

Although NSA does not *now* target communications of American citizens, groups, or organizations for interception by placing their names on watch lists, other selection criteria are used which result in NSA's reviewing many communications to, from, or about an American . . . . The combination of this technology and the use of words to select communications of interest results in NSA analysts reviewing the international messages of American citizens, groups, and organizations for foreign intelligence.

*Id.* at 743, 741. Between the early 1960's and 1973, NSA did include the names of American citizens on its watch lists. *Id.* at 744–45. In addition, between 1945 and 1975, NSA and its predecessor agencies conducted a program called Operation Shamrock, in which commercial cable companies provided the agencies with copies of most international telegrams sent abroad from the United States. *Id.* at 765–76.

Appellant Salisbury has served the *New York Times* as a foreign correspondent and editor since 1949, and has used international communications media extensively, both as sender and as recipient of messages. Affidavit of Harrison E. Salisbury, J.A. at 54–57. He claims that learning of the NSA's intelligence activities has adversely affected his exercise of first amendment rights by rendering him unwilling to "include in [his] messages information which [he does] not want [his] own government to know or in-

formation which [his] government may pass on to its allies." *Id.* at 58.

Salisbury learned by means of Freedom of Information Act requests that the CIA and FBI maintained records pertaining to him, records that had been provided them by the NSA. The NSA, denying appellant access to these records, has indicated that "[e]ach of the NSA records being withheld . . . is an intercepted foreign communication." Affidavit of Eugene F. Yeates, *supra,* J.A. at 22. Although the agency would not indicate the nature of the communications, that is, whether they were sent to Salisbury, were sent from him, or merely mentioned him, Salisbury, reasoning that he had sent many communications from locations of great intelligence interest, assumed that at least some of them were communications he had sent. As a result, he filed an administrative claim under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 *et seq.* (1976), seeking damages of $10,000 to compensate him for alleged violations of his first and fourth amendment rights and of his common law right of privacy. He also sought an injunction barring the government from further interception of his communications. Upon exhausting his administrative remedies under both FOIA and FTCA, he brought suit in the District Court on April 10, 1980.

In the District Court, the government moved for summary judgment as to Salisbury's FOIA claim, contending that the disputed documents were properly classified and, hence, exempt from disclosure under FOIA exemption 1, 5 U.S.C. § 552(b)(1) (1976). J.A. at 11–15. Second, it moved for dismissal of Salisbury's claim for damages and equitable relief, asserting that without the disputed information, which it believed to be protected by the state secrets privilege, as well as exempt from disclosure under FOIA, Salisbury's suit could not proceed. *Id.* at 43. Third, in support of both state secrets and FOIA claims, the government sought leave to present for *ex parte in camera* examination several affidavits to support its contention that disclosure would threaten the national interest. *Id.* at 51.

Appellants opposed all three motions and sought, in addition, to have his counsel participate in any *in camera* examination of documents the Court might resolve to conduct.

The District Court issued its decision in three separate orders. First, relying on exemption 1 of FOIA, the court upheld the decision of the agency to withhold the disputed records. *Id.* at 64–72. In so holding, the court relied heavily on an affidavit filed by the Chief of NSA's Office of Policy, Eugene F. Yeates.

In a second order, the court dismissed appellant's action for damages and equitable relief, *id.* at 77–78, finding that further litigation "would reveal highly classified information to the detriment of the nation's security interests." *Id.* at 78. The court refused to employ a presumption that NSA had intercepted appellant's messages, or to find as a fact such interception, as a litigating penalty upon the government for insisting upon its state secrets privilege.

In a third order, the court declined to permit Salisbury's counsel to participate in the *in camera* examination of classified affidavits submitted in support of the claims of privilege and FOIA exemption because of the sensitivity of the material, and the delay and ethical dilemmas that might attend such participation. *Id.* at 74–76.

Salisbury has appealed from all three of these rulings.

### A. *The Freedom of Information Act Claim*

▮▮▮ Under the Freedom of Information Act, judicial review of an agency's decision to withhold information is to be *de novo*, with the burden on the agency to justify its claim of exemption. 5 U.S.C. § 552(a)(4)(B) (1976). *See Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C.Cir. 1981). The legislative history of the Act, however, indicates that courts must "recognize that the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [*sic*] might occur as a result of public disclosure of a particular classified record." S.Rep.No. 1200, 93d Cong., 2d Sess. 12 (1974) (conference report).

Consequently, courts are to "accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." *Id. See also Halperin v. CIA*, 629 F.2d 144, 148 (D.C.Cir. 1980) (Judges "lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case"; they must "not . . . conduct a detailed inquiry to decide whether [they] agree[ ] with the agency's opinions."). If the agency's affidavits describe the withheld information and the justification for withholding with reasonable specificity, demonstrating a logical connection between the information and the claimed exemption, and if the affidavits evidence neither bad faith on the part of the agency nor a conflict with the rest of the record, the agency is entitled to summary judgment. *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C.Cir.1981); *Allen v. Central Intelligence Agency*, 636 F.2d 1287, 1291 (D.C.Cir.1980); *Lesar v. United States Dept. of Justice*, 636 F.2d 472, 481 (D.C.Cir.1980).

The NSA claims that the disputed records are exempt from mandatory disclosure under FOIA pursuant to exemption 1, 5 U.S.C. § 552(b)(1) (1976), which applies to matters that are

(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order.

The agency designates as applicable Executive Order No. 12065, 3 C.F.R. 190 (1979).[1]

Appellant contends that summary judgment was inappropriate with regard to the claim of exemption because (1) there was evidence in the record that contradicted the

---

1. The agency also claims that the disputed material may be withheld under exemption 3, 5 U.S.C. § 552(b)(3) (1976). Finding exemption

1 applicable, the District Court did not discuss any other exemption.

agency's affidavits, (2) the District Court refused to review *de novo* the agency's assertions that it had complied with the requirements of the Executive Order, and (3) the court improperly conducted an *ex parte in camera* review of certain affidavits.

We turn first to the contention that contradictory evidence pervades the record. In particular, appellant takes issue with the agency's assertions that little authoritative information exists in the public domain concerning its surveillance activities, and that revealing the fact of interception would jeopardize the national security. With regard to the former, appellant points to another case, *Jabara v. Kelley,* 476 F.Supp. 561 (E.D.Mich.1979), *appeal docketed,* No. 80–1391 (6th Cir. May 28, 1980), in which the agency disclosed that it had intercepted the messages of the plaintiff in that case, and to the admission of the Director of the NSA before Congress that the agency had at times monitored communications between Hanoi and the United States. In addition, both a Senate report and an opinion of this court discuss to some extent the monitoring practices of the NSA. *See* S.Rep.No.755, *supra,* at 735–83; *Halkin v. Helms,* 598 F.2d 1, 4 (D.C.Cir.1978). Thus, appellant argues, the agency has already released a large amount of information and should be made to indicate in detail why the increment sought in the instant case would be harmful. With regard to the second point, Salisbury contends that he has sent so many communications, including some between Hanoi and the United States, in so many different ways, that it would be impossible to infer much from the bare fact that his communications had at times been intercepted.

■■ We are persuaded, as was the District Court, that this evidence is not contradictory and does not undermine the agency's affidavits. The fact of disclosure of a similar type of information in a different case does not mean that the agency must make its disclosure in every case. As this court stated in *Halkin v. Helms,* 598 F.2d 1 (D.C.Cir.1978):

> The government is not estopped from concluding in one case that disclosure is permissible while in another case it is not. As we have said, the identity of particular individuals whose communications have been acquired can be useful information to a sophisticated intelligence analyst. We see nothing inconsistent with the Secretary's assertion of the privilege here and the disclosure that occurred in the *Jabara* case.

*Id.* at 9. Likewise, the agency's admission that at one time it had monitored communications transmitted between the United States and Hanoi does not reveal, as might the information sought in this case, the particular channels monitored. And bare discussions by this court and the Congress of NSA's methods generally cannot be equated with disclosure by the agency itself of its methods of information gathering. *See Military Audit Project v. Casey,* 656 F.2d 724, 752–53 (D.C.Cir.1981); *Phillippi v. CIA,* 655 F.2d 1325, 1332–33 (D.C.Cir.1981). In any event, owing to the "mosaic-like nature of intelligence gathering," Appellee's Br. at 18, and to our desire to avoid discouraging the agency from disclosing such information about its intelligence function as it feels it can without endangering its performance of that function, we will not hold in this case that such limited disclosures as have been made require the agency to make the disclosure sought here.[2]

■ The NSA's Yeates affidavit also satisfies the other criteria for summary judgment. It describes the disputed material in sufficient detail as "intelligence product derived from the intercept of foreign electromagnetic transmissions," J.A. at 18, and as "communications intelligence products classified in their entirety to protect intelligence sources and methods." *Id.* at 22. It also sets forth with reasonable specificity the reasons for withholding the material,

---

**2.** *See United States v. Marchetti,* 466 F.2d 1309, 1318 (4th Cir.) ("What may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context."), *cert. denied,* 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972).

stating that while the NSA's intelligence collection method is generally known, "[t]he continued efficacy of this method requires that the circuits actually monitored remain unidentified," *id.* at 21, and "[n]o meaningful portion of any of the records could be segregated and released without identifying the communications underlying the communications intelligence report." *Id.* at 22. Such revelation could lead to the loss of an intelligence source, which "losses are harmful to the national security." *Id.* This court has found this same argument plausible under similar circumstances. *See Hayden v. NSA,* 608 F.2d 1381, 1388 (D.C.Cir. 1979) ("The [NSA] states that to reveal which channels it monitors [by revealing material gleaned from intercepted communications] would impair its mission; this is by no means an illogical or implausible assertion; indeed, it appears inherently logical that this assertion is true . . . ."), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980).

The affidavit also indicates clearly that the disputed records were properly classified "pursuant to both procedural and substantive criteria contained" in the relevant Executive Order. S.Rep.No.1200, *supra,* at 12. *See Halperin v. Department of State,* 565 F.2d 699, 703 (D.C.Cir.1977). Appellant claims that the material was improperly classified with regard to section 3–303 of Executive Order 12065, *supra,* which states that

[i]t is presumed that information which continues to meet the classification requirements in Section 1–3 requires continued protection. In some cases, however, the need to protect such information may be outweighed by the public interest in disclosure of the information, and in these cases the information should be declassified. When such questions arise, they shall be referred to the agency head, a senior agency official with responsibility for processing Freedom of Information Act requests or Mandatory Review requests under this Order, an official with Top Secret classification authority, or the Archivist of the United States in the case of material covered in Section 3–503. That official will determine whether the public interest in disclosure outweighs the damage to national security that might reasonably be expected from disclosure.

Appellant argues that courts must review *de novo* these determinations by agency officials. He relies for this assertion on the necessity of procedural compliance to proper classification, and, consequently, to exemption 1 applicability, and on the statutory requirement that courts review *de novo* agency claims of exemption. Appellee, on the other hand, argues that the language of section 3–303 does, and was intended to, endow the designated officials with a broad discretionary authority, and that determinations made pursuant to it are reviewable, if at all, under a far narrower standard.

The District Court accepted the appellee's construction of 3–303. In holding that the application of the provision is "a matter committed to agency discretion by law," J.A. at 70, the court stated that

[t]he plain words of § 3–303 indicate that the provision does not mandate [balancing] in all cases, but instead simply authorizes it in exceptional cases where the public interest in disclosure might be paramount. The provision was not intended to modify the procedural requirements for classification.

*Id., quoting Patterson v. CIA,* No. 78–0070, slip op. at 9 (D.D.C. Feb. 5, 1981) (mem.). The court concluded that because "[s]ection 3–303 did not modify classification standards . . . [it] is irrelevant to the FOIA request at issue here." J.A. at 71.

Most courts which have considered the requirements of 3–303 have accepted this conclusion. *See, e.g., Patterson v. CIA,* No. 78–0070, slip op. at 9 (D.D.C. Feb. 5, 1981) (mem.); *Ground Saucer Watch, Inc. v. CIA,* No. 78–859, slip op. at 10–11 (D.D.C. May 30, 1980) (mem.), *aff'd,* 665 F.2d 394 (D.C. Cir.1981) (mem.); *Andres v. CIA,* No. 80–0865, slip op. at 22 (D.D.C. April 28, 1981) (mem.), *reversed and remanded for other reasons,* 673 F.2d 550 (D.C.Cir.1982) (judg-

ment order); *Afshar v. Department of State,* No. 76–1421 (D.D.C. Oct. 24, 1980), *appeal docketed,* No. 81–1299 (D.C.Cir. Feb. 2, 1981). In addition, a letter sent from then National Security Advisor Zbigniew Brzezinski to James Rhoads, Chairman of the Interagency Classification Review Committee, reinforces this interpretation. Brzezinski stated that

> [t]he purpose of the balancing test provision is to permit the declassification of properly classified information in those exceptional cases where the public interest in protection of such information is outweighed by the public interest in its disclosure. The Order recognizes that cases meeting the criterion of section 3–303 will be rare, and that information considered for declassification that continues to meet the classification requirements of section 1–3 despite the passage of time must, in most cases, remain classified.
>
> *This provision is not intended to modify the substantive criteria or procedures for classification* . . . .

The Order does not establish a particular procedure to be followed in those exceptional cases where section 3–303 might apply. . . . Each agency should establish its own procedures to ensure that individuals making declassification decisions identify those cases that should be referred to senior agency officials designated to make the *discretionary* determinations under section 3–303.

J.A. at 61 (emphasis added).

We need not decide whether the agency's duty to balance in the first instance is discretionary, for it is clear in the instant case from the Yeates affidavit that both Mr. Yeates, Chief of the NSA's Office of Policy, and Roy R. Banner, Yeates's predecessor, conducted balancing pursuant to 3–303. *See* J.A. at 18. They concluded that "the documents should continue to be classified because of the damage their unauthorized disclosure would reasonably be expected to cause to communications intelligence activities of the United States Government." *Id.*

■ This is a matter as to which the agency has a large measure of discretion. In the instant case, the court sees no reason to upset the agency's exercise of that discretion. The Yeates affidavit elaborates at length on the precise nature of the potential harm to the NSA's intelligence activities, and why such harm could be expected to arise from disclosure. Consequently, we believe that the District Court was correct in determining that the information was properly classified pursuant to Executive Order 12065, and, because the Yeates affidavit meets the test of specificity, we affirm the District Court's determination that the agency was entitled to summary judgment on the FOIA cause of action.[3]

---

**3.** Because we hold that appellee's public affidavits sufficed to establish its FOIA exemption claim, we cannot accept appellant's contention that the District Court was not entitled to review the agency's nonpublic affidavits *in camera.* While *in camera* proceedings under FOIA "should be employed only where absolutely necessary," *Allen v. CIA,* 636 F.2d 1287, 1298 n.63 (D.C.Cir.1980), because they are "necessarily conducted without benefit of criticism and illumination by a party with the actual interest in forcing disclosure," *Vaughn v. Rosen,* 484 F.2d 820, 825 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), this court has recognized that, particularly in national security cases, resort to such proceedings may be necessary or desirable. *Ray v. Turner,* 587 F.2d 1187, 1211 n.43 (D.C.Cir.1978); *Phillippi v. CIA,* 546 F.2d 1009, 1012–13 (D.C.Cir.1976). In the instant case, although resort to *in camera* affidavits was not strictly necessary, the public affidavits being

sufficient to support the agency's claim, the District Court was within its discretion in recognizing that important rights were at stake, and in wishing to "confirm[ ]" what the public affidavits already indicated. J.A. at 72.

Likewise, we find no error in the decision of the District Court to exclude appellant's counsel from the *ex parte* proceedings. In any FOIA case in which considerations of national security mandate *in camera* proceedings, the District Court may act to exclude outside counsel when necessary for secrecy or other reasons. In the instant case, this discretion is strengthened by the optional nature of the *in camera* proceeding, as noted above. Because the public explanation sufficed, the District Court was free to look at the affidavits *ex parte,* and its reasons for excluding appellant's counsel from such scrutiny—danger to the national security, delay, and ethical considerations—sufficed to justify its decision, particu-

### B. The Claim for Injunctive and Monetary Relief

Having found that the disputed material was exempt from mandatory disclosure under the Freedom of Information Act and was privileged as a state secret, a determination that the appellant does not challenge before this court, the District Court dismissed the appellant's action for damages and injunctive relief.

Appellant challenges this disposition. He claims that the appropriate means for resolving the clash between discovery and privilege is a balancing test, setting the national security interest against the need to protect individual rights. In this case, he argues,

> where the record establishes a strong likelihood that NSA has intercepted Mr. Salisbury's messages and plaintiff seeks relief only against the government, the district court upon sustaining the claim of privilege should have either entered a finding in plaintiff's favor on his allegations of interception or inferred from the undisputed facts in the record that NSA has intercepted Mr. Salisbury's messages.

Appellant's Br. at 24 (footnote omitted). Salisbury relies on the "principles of the common law," as incorporated in the Federal Rules of Evidence, on the Rules themselves, and on recent case law.

The Federal Rule dealing with privilege presently provides that the law of privilege "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501. Appellant suggests that these "principles" require an examination of the values underlying the privilege asserted, and a heavy weighing of " 'individual freedom and privacy, and widely recognized ethical and moral convictions.' " Appellant's Br. at 25, quoting 2 D. Louisell and C. Mueller,

Federal Evidence § 201, at 416 (1978). He concludes that this balance favors permitting his suit to proceed through either a factual finding or a presumption of interception.

Salisbury notes that the Federal Rules of Evidence, as originally proposed, would have permitted this result. See Proposed Rules of Evidence for the United States District Courts and Magistrates, 46 F.R.D. 161, 273–74 (1969) (preliminary draft); Proposed Rules of Evidence for the United States Courts and Magistrates, 51 F.R.D. 315, 375–76 (1971) (revised draft). In addition, a recent district court case, Liuzzo v. United States, 508 F.Supp. 923 (E.D.Mich. 1981), might be read to support a similar result. Liuzzo was a case brought under the Federal Tort Claims Act by the survivors of a woman whose death, it was alleged, was caused by the Federal Bureau of Investigation. Plaintiffs sought discovery of a Department of Justice report as to which the government claimed executive privilege, which protects from discovery "intragovernmental documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies arc formulated." Id. at 937, quoting Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena, 40 F.R.D. 318, 324 (D.D.C.1966), aff'd sub nom. V. E. B. Carl Zeiss, Jena v. Clark, 384 F.2d 979 (D.C.Cir.), cert. denied, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967). The court in Liuzzo sustained the government's claim of privilege. Balancing "the government's professed need for secrecy with the plaintiffs' need to prove their case," 508 F.Supp. at 939, and considering in particular "evidence of considerable violent and illegal activity . . . which was, at least at times, apparently known of by [government] agents," id. at 940, however, the court held that the price for a successful assertion of executive privilege would be "a finding of liability on the part of the defendant." Id.

---

larly as the Court found the presence of appellant's counsel "not strictly necessary to the resolution of plaintiff's claim." J.A. at 75. See Hayden v. NSA, 608 F.2d 1381, 1385–86 (D.C. Cir.1979), cert. denied, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980); Halkin v. Helms,

598 F.2d 1, 7 (D.C.Cir.1978). See also Weberman v. NSA, 668 F.2d 676, 678 (2d Cir. 1982), ("The risk presented by participation of counsel . . . outweighs the utility of counsel, or adversary process, in construing a [classified affidavit].") (citation omitted).

Appellant is correct in asserting that the issue is to be resolved by recourse to a balancing test. *See Attorney General of the United States v. The Irish People, Inc.,* No. 81–1035, slip op. at 47–50 (D.C.Cir. July 2, 1982). *See generally* Note, *The Military and State Secrets Privilege: Protection for the National Security or Immunity for the Executive?,* 91 Yale L.J. 570 (1982). *Cf. Zerilli v. Smith,* 656 F.2d 705, 711–12 (D.C.Cir.1981) (reporter's privilege). We are not persuaded, however, by appellant's assertion that, in the circumstances of this case, such a test dictates employment of a finding of fact or presumption of agency interception.

In *Halkin v. Helms,* 598 F.2d 1 (D.C.Cir. 1978), this court explained the difficulties with proceeding on the basis of a presumption in a similar factual context in the face of an exercise of the state secrets privilege:

> The underlying premise of the argument is that the defendants should not be permitted to avoid liability for unconstitutional acts by asserting a privilege which would prevent plaintiffs from proving their case. . . . The premise is faulty. The defendants are not asserting the privilege to shield allegedly unlawful actions; the state secrets privilege asserted here belongs to the United States and is asserted by the United States which is not a party to the action. It would be manifestly unfair to permit a presumption of acquisition of the watchlisted plaintiffs' international communications to run against these defendants.

4. Although in the instant case, the United States, rather than a private party, is the defendant, government agencies and officials were defendants in *Halkin* as well with respect to the claim for injunctive relief, which the court also dismissed. In addition, in the instant case, use of the desired presumption in the action for damages might cause harm to the public fisc unwarranted here by the nature of the record evidence and the assertion of a legitimate government privilege. Although we must not act as a "self-constituted guardian of the Treasury [by] import[ing] immunity back into a statute designed to limit it," *Indian Towing Co. v. United States,* 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955), "when dealing with a statute subjecting the Government to liability for potentially great sums of money,

*Id.* at 10 (citation and footnote omitted).[4] *Cf. Black v. Sheraton Corp. of America,* 564 F.2d 531, 545 n.8 (D.C.Cir.1977) ("we have some doubts about the use of the sanctions invoked, and the broad and sweeping presumption of causation, in a case that does not appear to be one of bad faith disobedience").

The Supreme Court has indicated that the assertion by the government of the state secrets privilege does not compel the issuance by a court of any sanction whatsoever. In fact, the Court has implied that such sanctions, if ever appropriate in the state secrets context, are to be used only infrequently. In *United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), a Federal Tort Claims case involving the state secrets privilege, the Court stated that the government could not be punished for asserting the privilege "in a civil forum where the Government is not the moving party, but is a defendant only on terms to which it has consented." *Id.* at 12, 73 S.Ct. at 534.[5] *See also* E. Cleary, *McCormick's Handbook of Evidence* § 109, at 234 (2d ed. 1972) ("[W]hen the government is defendant, as under the Tort Claims Act, an adverse finding cannot be rendered against it as the price of asserting an evidentiary privilege. This is not one of the terms upon which Congress has consented that the United States be subjected to liability." (Footnote omitted.)).

This conclusion may be particularly strong in the state secrets context. In fact, the *Liuzzo* court itself indicated that its

[we] must not promote profligacy by careless construction." *Id.* (discussing the Federal Tort Claims Act). We believe in this case that by promulgating the FTCA, Congress did not, and perhaps could not for constitutional reasons, *see Black v. Sheraton Corp. of America,* 564 F.2d 531, 541 (D.C.Cir.1977), abrogate the state secrets privilege of the executive.

5. While it is true that the Court in *Reynolds* employed a balancing test, setting the would-be discoveror's need for the information against the need to protect state secrets, the Court cast its net wider in setting forth the rule that the government was not to be punished for assertion of its privilege.

disposition might be inappropriate when the state secrets privilege was invoked. 508 F.Supp. at 940. *See American Civil Liberties Union v. Brown,* 619 F.2d 1170, 1173–74 (7th Cir. 1980) (en banc) (implying need for special protection for foreign intelligence materials). *Cf. Black v. Sheraton Corp. of America,* 564 F.2d 531, 541 (D.C.Cir.1977) (indicating that the state secrets privilege may require different treatment from other types of executive privilege).

This court has recently affirmed this position in *Attorney General of the United States v. The Irish People, Inc.,* No. 81–1035 (D.C.Cir. July 2, 1982). *Irish People* was a suit brought by the Attorney General to compel defendant-appellee publisher to register as an agent of a foreign principal under the Foreign Agents Registration Act, 22 U.S.C. §§ 611 21 (1976). The publisher sought to discover certain documents as to which a claim of state secrets privilege was successfully asserted by the United States. The District Court concluded that because defendants needed those documents in order to pursue their defense, the assertion of the privilege meant that the action had to be dismissed. This court reversed, stating that

> courts must balance a number of factors in determining how to proceed when one side or the other has claimed that certain evidence is privileged. Thus, even if defendant would normally be entitled to discovery, it does not follow that, if there can be no discovery in the particular case, dismissal is the only choice available to the court.

Slip op. at 44. The court noted that even in a case such as *Irish People,* which could ultimately result in criminal penalties, the proceeding then before it—a civil proceeding—could not be equated with a criminal proceeding in which it might well be unfair to let the government proceed while preventing full discovery. *Id.* at 44 n.127.

Other courts have also refused to employ sanctions against the United States for exercise of its state secrets privilege. For example, in *Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.,* 368 F.Supp. 1098 (S.D.N.Y.1973), *aff'd,* 505 F.2d 989 (2d Cir. 1974), the United States interposed a state secrets claim to protect its intelligence sources. The defendant insurer argued that the assertion of privilege should result in judgment against the United States. The court rejected this claim. In particular, the court stated that

> the notes of the Advisory Committee suggest a narrow construction of Rule 509(e) as it relates to the privilege here in question in view of the decisions reflecting an "unwillingless to allow the government's claim of privilege for secrets of state to be used as an offensive weapon against it. *United States v. Reynolds, supra.*"

*Id.* at 1141 n.56. Likewise, the court in *Kinoy v. Mitchell,* 67 F.R.D. 1 (S.D.N.Y. 1975) indicated that "[s]anctions are only available where the privilege is overruled but the documents still withheld." *Id.* at 15 n.50. *See also Sigler v. LeVan,* 485 F.Supp. 185, 192–95 (D.Md.1980).

Appellant can derive little support from the text of the proposed Federal Rule of Evidence. While the proposed rule would indeed have *permitted* the District Court to employ the sanction of dismissal against the United States for its exercise of the privilege, it would not have *compelled* this result, *see* Rules of Evidence for United States Courts and Magistrates, Rule 509(e), 56 F.R.D. 183, 252 (1973); *Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.,* 368 F.Supp. 1098, 1141 n.56 (S.D.N.Y.1973), *aff'd,* 505 F.2d 989 (2d Cir. 1974), and, in any event, the rule was not adopted in that form.[6] In its final form, the rule on privilege merely codifies the common law, *see* page 974 *supra,* which, as the court noted in *Kinoy,* "limits the

---

**6.** In addition, the drafters of the proposed rule appeared to contemplate continuing the *Reynolds* rule against penalizing the government for assertion of the privilege in a civil case. The Advisory Committee's note on proposed Rule 509 states that privileged materials "may relate

to an element of a plaintiff's claim against the government, with the decisions indicating unwillingless to allow the government's claim of privilege for secrets of state to be used as an offensive weapon against it." 56 F.R.D. 183, 254 (1973).

Court's possibilities in a civil action against Government officials or the United States." 67 F.R.D. at 15 n.50.

In the instant case, the District Court clearly balanced the appropriate factors in determining that dismissal was necessary. In particular, recognizing that a court "must probe deeply into the claim of privilege where, as here, maintenance of the action depends upon production of the requested information," J.A. at 77, and considering therefore the possibility of employing a presumption, the court determined that "litigation [would] lead to the eventual discovery of privileged matters." *Id.* at 78. Thus, dismissal of the action became necessary. As the Supreme Court has recently indicated,

> "public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated."

*Weinberger v. Catholic Action of Hawaii/Peace Education Project,* 454 U.S. 139, 146, 102 S.Ct. 197, 203, 70 L.Ed.2d 298 (1981) (citing *Reynolds*), *quoting Totten v. United States,* 92 U.S. 105, 107, 23 L.Ed. 605 (1875). *See also Farnsworth Cannon, Inc. v. Grimes,* 635 F.2d 268, 281 (4th Cir. 1980) (en banc). We agree with the District Court that the instant case is such a case, and that, under these circumstances, dismissal is the appropriate response.

The judgment of the District Court in affirming the NSA's claim of FOIA exemption, in barring appellant's counsel from *in camera* examination of agency affidavits, and in dismissing appellant's action for monetary and injunctive relief is affirmed.

*It is so ordered.*