John ABBOTTS, Public Interest Research Group, Natural Resources Defense Council

v.

NUCLEAR REGULATORY COMMISSION, Appellant.

No. 84–5423.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 16, 1985.

Decided July 9, 1985.

Nicholas S. Zeppos, Atty., Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., William H. Briggs, Jr., Sol., Nuclear Regulatory Com'n, Dan M. Berkovitz, Atty., Nuclear Regulatory Com'n, and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on brief, for appellant.

Eric R. Glitzenstein, Washington, D.C., with whom Alan B. Morrison and William B. Schultz, Washington, D.C., were on brief, for appellees.

Before TAMM and BORK, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge.

Petitioner Nuclear Regulatory Commission appeals from an order of the district court requiring the Commission[1] to disclose information pertaining to the protection of nuclear facilities against terrorist attack. Because the district court improperly applied exemption 1 of the Freedom of Information Act (FOIA), we reverse and remand with directions to enter summary judgment for the Commission.

---

1. For convenience, we will refer to both the Nuclear Regulatory Commission and its predecessor, the Atomic Energy Commission, as "the Commission."

## I. BACKGROUND

In 1974, the Commission began studying the possibility of recycling spent nuclear fuel for use in nuclear power reactors. A year later the Commission published the Generic Environmental Impact Study on the Use of Recycled Plutonium in Mixed Oxide Fuel in Light Water Reactors ("GESMO"). The GESMO report recommended approval of the recycling program because it offered a solution to the vexing problem of disposing of nuclear waste and promised a plentiful source of fuel for the nuclear power industry. The report drew heavy criticism, however, because it failed to address the security problems raised by recycling nuclear fuel: unlike the uranium typically used in nuclear reactors, thematerial produced from recycling—plutonium—can be used to manufacture nuclear weapons. Recycling thus raised the risk of theft, sabotage, and diversion of plutonium to countries seeking to build nuclear weapons. In response to this criticism, the Commission undertook further study, culminating in the 1977 publication of the "Draft Safeguards Supplement." Redacted from the Supplement, however, was a page discussing "baseline threat levels" ("BTLs"), the number of attackers the security systems in nuclear facilities should be designed to defend against.

In 1977, plaintiffs filed this FOIA request with the Commission seeking release of numerous documents pertaining to nuclear plant and nuclear materials security. This appeal concerns only one document: the redacted page of the GESMO Supplement containing the BTLs used by the Commission in regulating the safety of nuclear facilities. After considering affidavits submitted by the Commission, the district court held that the withheld information does not fall within exemption 1 of the FOIA and entered summary judgment for the plaintiffs.

## II. DISCUSSION

Exemption 1 of the Freedom of Information Act protects from disclosure matters that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of the national defense or foreign policy" and "are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1) (1982). Executive Order 12,356 provides that "'[c]onfidential' shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause damage to the national security." 47 Fed.Reg. 14875 (1982). The Executive Order authorizes the classification of information concerning "United States Government programs for safeguarding nuclear materials or facilities." 47 Fed.Reg. 14876.

In determining whether an agency has properly withheld information pursuant to exemption 1, the district court must "determine the matter de novo," 5 U.S.C. § 552(a)(4)(B) (1982), placing the burden on the agency to sustain its claim for exemption. *See Miller v. Casey*, 730 F.2d 773, 776 (D.C.Cir.1984). Because "'[e]xecutive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of public disclosure,'" however, courts are required to "'accord substantial weight to an agency's affidavit concerning the details of the classified status of a disputed record.'" *Salisbury v. United States*, 690 F.2d 966, 970 (D.C.Cir.1982) (quoting S.Rep. No. 1200, 93d Cong. 2d Sess. 12 (1974) (conference report)), U.S.Code Cong. & Admin. News 1974, pp. 6267, 6290. Accordingly, an agency is entitled to summary judgment if its affidavits "describe the withheld information and the justification for withholding with reasonable specificity, demonstrating a logical connection between the information and the claimed exemption," *id.* at 970, and "are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C.Cir.1981).

The affidavits provided by the Commission clearly describe the document and give specific justifications for nondisclosure. According to Mr. Burnett, Director

of the Division of Safeguards of the Commission's Office of Nuclear Material Safety and Safeguards, "[t]he GESMO Report contains the NRC's determination as to the number of attackers a nuclear facility should be able to defend against successfully." Joint Appendix (J.A.) 35. This information is identified by a number of exhibits as the Commission's official policy on threat levels used to measure security of nuclear facilities.[2] Thus, by "knowing the size of the design basis threat that the NRC uses as a guide to evaluate security systems, an adversary can compute the size of the assault force needed for optimum results." J.A. 35–36. Release of the GESMO information "would therefore increase the probability of a successful attack on a fuel facility." *Id.* The affidavits presented by the Commission therefore demonstrate "a logical connection between the information and the claimed exemption." *Salisbury v. United States,* 690 F.2d 966, 970 (D.C.Cir.1982).

The district court apparently found that while the Commission's explanation was facially plausible, conflicting evidence in the record showed that (1) similar information had already been released into the public domain, and (2) the information was not as dangerous as other information that could have been released.

To support its finding that the information sought is already in the public domain, the district court listed examples of either specific estimates of maximum credible threat levels or specific appraisals of existing nuclear plants that had been released to the public in the past decade. For example, in April 1974, a Commission-sponsored study estimated that the maximum credible external threat to a nuclear facility was a force of fifteen highly trained men. J.A. 78. A 1975 Commission study concluded that there was a "consensus estimate that an external threat group will probably number about 6–8 persons and very likely not exceed 12 persons." J.A. 84. A December 1975 memorandum to the Commission from the Defense Intelligence Agency stated that a security system should be prepared to repel an adversary group comprised of "approximately 12 dedicated, well-trained, well-armed personnel." J.A. 97.

█ The district court's finding that the similarity of these estimates to the information withheld weakens the Commission's claim to exemption reveals a basic misunderstanding of the nature of the information withheld. All the documents provide estimates by government officials as to the proper level of threat a nuclear facility should guard against. The information withheld, however, is unique in one critical respect: the undisclosed threat levels are those that the Commission has chosen as its *official policy.*[3] The withheld data could be identical to an estimate in the public domain, but the public does not know which—if any—estimate the Commis-

**2.** In 1979 the Commission issued its current safeguard regulations, which provide that nuclear facilities shall be designed and operated to withstand an "external assault ... by a small group." 10 C.F.R. § 73.1(a)(2) (1985). The regulations do not define small group, nor do they reference the GESMO Supplement. Yet, as Mr. Whipp, Chief of the Commission's Information Security Branch, stated, the withheld data "reflects current NRC safeguards rules by giving a numerical meaning to the word 'group' as used in 10 C.F.R. § 73.1(a)(2)." Joint Appendix (J.A.) 46.

The number of attackers that licensees must guard against is, of course, made available to the licensees themselves. This is, however, the extent of the distribution. For example, in the Diablo Canyon licensing hearing, the Commission conducted *in camera* proceedings when GESMO figures were discussed and expunged from the record references to the BTLs and the GESMO Study. *See* J.A. 58.

**3.** The district court apparently did not believe that the withheld BTLs in fact were the Commission's policy. The only evidence cited by the court, a 1977 affidavit, merely shows that the GESMO Supplement did not originate as a definitive statement of the Commission's decision. J.A. 99–101. Affidavits subsequently submitted by the Commission, however, state unequivocally that the threat levels in the GESMO Supplement have become the Commission's official policy. In concluding otherwise, the district court did not give the required "substantial weight" to the Commission's uncontradicted affidavits.

sion has finally chosen.[4] *See Afshar v. Department of State*, 702 F.2d 1125, 1130 (D.C.Cir.1983) ("[E]ven if a fact ... is the subject of widespread media and public speculation, its official acknowledgment by an authoritative source might well be new information that could cause damage to the national security."); *Salisbury v. United States*, 690 F.2d 966, 971 (D.C.Cir.1982). Indeed, the disparity in the released estimates cited by the district court demonstrates that the final levels chosen by the Commission remain a well-kept secret.

 The district court also found that the document was not as dangerous as other information that could have been released because it "contains a range of figures; and as the NRC itself has submitted, ranges of threat levels are 'of substantially less value to an adversary' than single figures.'" J.A. 12. In addition, the security systems at existing facilities are designed to protect against larger groups of terrorists than is required by Commission policy. *Id.* Even if the information were disclosed, therefore, terrorists could only guess at the actual security system in place at a particular nuclear facility.

These findings, while undoubtedly correct, have nothing to do with whether the *information withheld* reasonably could be expected to cause damage to the national security. As with almost all information withheld under exemption 1, there exists other information which if released would pose a greater threat to the national security. Release of the Commission's baseline threat levels would do less harm than, for example, a detailed plan of the security systems in place at our major nuclear facilities. Exemption 1, however, "bars the court from prying loose from the government even the smallest bit of information that is properly classified." *Afshar*, 702 F.2d at 1130. Release of the baseline threat levels would reduce the uncertainty facing a terrorist bent upon sabotage. *See United States v. Marchetti*, 466 F.2d 1309, 1318 (4th Cir.) ("What may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context."), *cert. denied*, 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972). Even though more detailed security plans would be more helpful to a terrorist, the Commission's determination that disclosure of this information "reasonably could be expected to cause damage to the national security," Exec.Order No. 12,356, 47 Fed.Reg. 14875 (1982), is both "plausible and factually uncontradicted." *See Miller v. Casey*, 730 F.2d 773, 777 (D.C.Cir.1984). Therefore, we reverse the district court's order granting appellee summary judgment and remand the case for entry of summary judgment in favor of the Commission.

*So Ordered.*

---

4. As Mr. Burnett stated in a November 1983 affidavit, "[w]hat is public is merely a multitude of estimates or proposals for threat 'definitions.' Potential attackers can only guess at which one of these purported threats are actually used by the NRC. Release of the GESMO data would end this speculation." J.A. 38–39.